**RATTIKIN TITLE COMPANY, Appellant,**

**v.**

**GRIEVANCE COMMITTEE OF THE STATE BAR OF TEXAS, Appellee.**

No. 15592.

Court of Civil Appeals of Texas.

Fort Worth.

Oct. 29, 1954.

Rehearing Denied Dec. 10, 1954.

Richard Owens, Thompson, Walker, Smith & Shannon, Fort Worth, F. L. Kuykendall, Austin, for appellant.

Earl P. Hall, Austin, Rawlings, Sayers, Scurlock & Eidson, Nelson Scurlock, Fort Worth, for appellee.

MASSEY, Chief Justice.

This is an appeal by the Rattikin Title Company, a corporation, from a temporary injunction entered against it upon the application of the Grievance Committee of the State Bar of Texas. The Title Company was enjoined from preparing legal instruments as a part of any transaction to which it was not itself a party or the agent of a party,—and from making statements to any person, firm or corporation for which it was not the agent, regarding the purpose or effect of some legal instrument constituting a part of any transaction to which it was neither a party nor the agent of a party.

Judgment affirmed.

■ We shall premise our opinion in this case by pointing out that both the appellant and appellee seem to be of the opinion that certain individuals who are lawyers, engaged in the practice of law as such (and the agents, servants and employees of such lawyers), are affected by the order appealed from. The appeal has been taken by the corporation, Rattikin Title Company, and it and it alone is the appellant in the case before us. Therefore, of necessity we must disregard even the question of whether any other person, firm or corporation had the right of appeal, for only the Title Company appealed. Certainly the temporary injunction is operative to restrain the attorneys, agents, servants and employees of the party enjoined under provisions of Article 4661, R.C.S., but this would not restrain the same attorneys, etc., from performing the enjoined acts for other persons if they would be legitimately performed by such other persons as their attorneys, agents or employees. We confine ourselves to the specific order of the court below as same applies to the Title Company, and to the findings and conclusions of the trial judge relating to and purporting to support the order's entry. Of course, we resort to the records of the pleadings and the evidence as necessary to determine the propriety of such findings and conclusions and order.

The specific order of the court reads as follows:

"It Is Therefore Ordered that a temporary injunction be issued to continue in force and effect until this case is finally disposed of on its merits, enjoining and restraining the Rattikin Title Company, a corporation, and any officer, director, employee, attorney or stockholder thereof, from preparing any legal instrument which is not for execution by Rattikin Title Company or by a person or persons employed by it and to which neither the Rattikin Title Company nor the Kansas City Title Insurance Company is a party and in which these companies neither have nor acquire any interest in the subject matter of the instruments; and restraining and enjoining any officer, director, employee, attorney or stockholder of the Rattikin Title Company from giving advice, whether oral or written, to persons who are not employees of said title companies, as to the purpose and legal effect of instruments to which neither the Rattikin Title Company nor Kansas City Title Insurance Company is a party; and such temporary injunction shall be binding upon all persons having notice thereof in active concert or participation with the defendant, Rattikin Title Company. However, it is not intended by this order that any Notary Public who may be employed by Rattikin Title Company shall refrain from complying with the provisions of Article 6605, R.C.S. of Texas, in regard to taking the acknowledgment of a married woman privily and apart from her husband.

"All relief prayed for by way of temporary injunction, which is not hereby granted, is denied."

It is clear from the record that the appellant Title Company was the agent for the Kansas City Title Insurance Company, by which Insurance Company all the titles approved by the Title Company were insured. The Title Company was left free by the order of temporary injunction to do everything for its principal, the Insurance Company it was enjoined from doing as to third persons. It was also left free to do the same things for its own employees. The record reflects that the Title Company had attorneys employed as its servants rather than as attorneys are ordinarily employed to perform legal services for clients. By the provisions of the order of temporary injunction its attorney-employees were left free to prepare legal instruments as a part of any transaction to which the Title Company itself was a party, or to which the Insurance Company for which it was the agent was a party, or to which one of its employees was a party. Such attorney-employees were left free to make statements and representations regarding the purpose and effect of legal instruments (prepared by them or not) to persons they did not or could not represent and to whom they owed no duty, in connection with transactions to which either the Title Company or its principal, the named Insurance Company, was a party.

These same attorney-employees, as well as others in the employ of the Title Company, were, as the result of the court's order, enjoined from preparing legal instruments which would become a part of any transaction where such privity would not exist. They were likewise enjoined from making statements or giving advice as to the purpose or effect of any such character of instrument to any person, firm or corporation other than their employer and the Insurance Company for which it was agent in or in connection with any transaction to which neither such employer nor said principal were privy parties.

█ It was the contention of the appellee that the appellant was doing and performing the very things which it was enjoined from doing by the temporary injunction order. Reference to the record before us satisfies us that the Grievance Committee's petition alleged a cause of action, and that there was evidence of sufficient probative force to entitle the court below to determine that such things, alleged by the petition to constitute the unlawful practice of law by the Title Company, were being done. Appellee sought their enjoinder as constituting the unlawful practice of law. The Texas State Bar Act, in part at least, is statutory. See Article 320a–1, R.C.S. of Texas. The Rules of the State Bar of Texas, enacted as provided by Section 4 of said Article, are to be found in Vernon's Annotated Texas Civil Statutes immediately following the Article. These Rules have the same force and legal effect upon the matters to which they relate as the Texas Rules of Civil Procedure have to the matters to which they relate. By such Rules of the State Bar of Texas "all persons not members of the State Bar are hereby prohibited from practicing law in this State." The members in question are those attorneys licensed to practice law by the Supreme Court of Texas. There is no question but what the appellant Title Company is not, nor could it be, such a "person." Article XII of such Rules provides for an agency of the State Bar, to-wit: the Grievance Committee (which is the appellee herein and which was the plaintiff-petitioner in the court below) to prosecute appropriate suits against persons, firms and corporations other than the members of the State Bar for the purpose of suppressing, prohibiting or preventing the unauthorized practice of law by such others.

The "practice of law" is not defined by any statute presently in effect. This has been true since the repeal in 1949 of Article 430a of Vernon's Annotated Penal Code. Even when that Article was in effect, however, it was held that it was within the power and authority of the judicial branch of the government to determine what services and what acts constitute the practice of law. Grievance Committee of State Bar of Texas, Twenty-first Congressional Dist. v. Dean, Tex.Civ.App., Austin 1945, 190 S.W.2d 126.

It has been held that "conveyancing", "preparation of legal instruments of all kinds", and "all advice to clients" involve the practice of law. Stewart Abstract Co. v. Judicial Commission of Jefferson County, Tex.Civ.App;, Beaumont 1939, 131 S.W.2d 686; In re Duncan, 1909, 83 S.C. 186, 65 S.E. 210, 24 L.R.A.,N.S., 750.

█ As to the "preparation of legal instruments", those acts of any person in drawing deeds, notes, mortgages and releases relating to the property rights of others, when performed for a consideration, constitute the practice of law,—and those who give advice for a consideration to interested parties as to the purpose and legal effect of an instrument drawn by them for such interested parties practice law. See Hexter Title & Abstract Co. v. Grievance Committee, Fifth Congressional Dist., State Bar of Texas, 1944, 142 Tex. 506, 179 S.W. 2d 946, 157 A.L.R. 268, affirming Bar Ass'n of Dallas v. Hexter Title & Abstract Co., 175 S.W.2d 108, the Fort Worth Court of Civil Appeals.

█ When a corporation furnishes legal services to others and collects fees or receives profits therefor, directly or indirectly, such constitutes the practice of law, the performance of which may be enjoined. Stewart Abstract Co. v. Judicial Commis-

sion of Jefferson County, supra. See also the cases cited at page 952 of 179 S.W.2d of the opinion in the Hexter Title & Abstract Co. v. Grievance Committee, Etc., case, supra.

It is thus clear that the Title Company has, perforce the temporary injunction order, been enjoined from doing specific things which our courts have declared to constitute the practice of law. Such things, when done by a party such as the Title Company, are illegal acts. If the pleadings alleged the present commission of such acts or a future intent on the part of the Title Company to commit such acts unless it is restrained from so doing, the Grievance Committee was entitled to a hearing upon its application for a temporary injunction. As applied to the instant controversy, if upon that hearing the evidence introduced by it showed that such illegal acts are occurring or will occur in the absence of restraint, then the record shows that the Grievance Committee has demonstrated the existence of a probable right on the part of the organization for which it acts, the State Bar, to have an injunction writ issue, and a probable injury to that body should injunction writ be withheld.

The question of whether the very acts enjoined constitute the unlawful practice of law is not new in Texas. It is settled law that these acts constitute such unlawful practice when performed by an incorporated "Title and Abstract Company." In the case of Hexter Title & Abstract Co. v. Grievance Committee, Etc., supra, Chief Justice Alexander had a case which bore directly upon the question posed in the present instance. The Hexter Company was incorporated for the identical purposes that the Rattikin Title Company was incorporated (to-wit: to make, compile and own abstracts of title to lands and liens of all character on any property, or any other abstracts of record in this State, or county thereof, required by law), and the Hexter Company had a title insurance company for which it was agent, just as does the Rattikin Title Company in the Kansas City Title

Insurance Company. In the Hexter case, however, there was no third ingredient, to-wit: a law firm which purported to do all the things which constituted the practice of law. In the instant case this ingredient has been added in the law firm of Rattikin and Spiller, attorneys. In the Hexter case, all those acts constituting the practice of law (and which the authorities have held to constitute such practice) were done and performed by the Hexter Company through attorneys solely employed by it in its legal department. The Hexter Company defended that very similar suit on the theory, in part, that its acts through its agents who were also attorneys did not constitute the practice of law because there was no charge made for their services. The Supreme Court readily perceived and held that the work of such agent-attorneys was paid for by the Hexter Company's customers through the consideration paid the Hexter Company for other express services. In the present instance, the Title Company attempted to refrain from performing such acts, channeling their performance into the hands of attorneys, particularly Rattikin and Spiller. Messrs. Rattikin and Spiller are attorneys, and their association together is as a law firm which purports to do all of such things for clients which were held by the Hexter case to constitute the unlawful practice of law by the Title Company. These things the law firm performs for specific charges as attorney's fees. Certain of the very acts the Title Company was enjoined from performing,—the preparation of the instruments for conveyancing and for mortgaging and in the curing of titles,—were acts such Title Company contends it did not perform. It contends that the independent firm of Rattikin and Spiller performed such acts. But the record reflects that many of such acts were frequently and more or less continuously performed by the Title Company.

Another theory upon which the Hexter Company sought to defend the suit against it was based upon the premise that it, the Hexter Company, was a party to the negotiation and consummation of a particular transaction, culmination of which was its

issuance of a title insurance policy,—and if such a transaction be not properly considered as one and indivisible, then the transaction to which it was a party, to-wit: the examination of title to determine that it was one which it would insure with the insurance company for which it was the agent,—and the act of effectuating such title insurance, necessarily entailed the action of its attorney-employees in the preparation of the instruments of conveyance, etc., and in the curing of title defects, and in the supervision and direction of the acts involved in conveyancing, mortgaging, etc. The Supreme Court held, in effect, that in the issuance of a title policy, to which the title company would be a party or be acting for a party, the seller would not be a party to that transaction though he paid the premium therefor, and that in the conveyance of real estate to a buyer by a seller, the title company would not be a party to that transaction for it neither had nor acquired any interest in the property by reason thereof. In his opinion, Judge Alexander pointed out by analogy to circumstances theorized in certain extremes the legal as well as practical necessity of considering certain facets of the involved negotiation and consummation of modern day real estate conveyancing and financing, etc., as several and distinct transactions— not necessarily incident to one another or inclusive one of the other. The reasoning of the opinion readily discloses that as to a mortgage of the property the seller is not necessarily a party to the mortgage transaction, especially where there was no mortgage on the property prior to the title conveyance,—nor would the buyer or seller necessarily be a party to a mortgagee's title policy issued only to protect the mortgagee. The Supreme Court held that it would only be as to transactions in which the Hexter Company was in privity as a party that the company's attorney-employees or other agents could prepare instruments whereby it either had or acquired an interest in property by reason thereof, and could make statement as to the purpose and effect of such instruments to third persons. In the present instance, there is no directly advanced defense by the Rattikin Title Company based upon this same defensive theory, though the "thread" containing this thought on its part runs through all its argument as contained in its brief.

In the Hexter case, the title company frankly did the things constituting the practice of law, seeking primarily to justify the performance of these things by refraining (as it believed) from making any charge therefor, and in the alternative, to justify their performance by contending that it was a party to the single transaction involved, or all of the several transactions involved. Here the Rattikin Title Company has sought to refrain from doing these things as a corporation, acting as it must through its agents, servants, etc.,—and instead has sought to cast the responsibility for the performance of such acts upon attorneys who are not acting as its employees. In most instances it sought to cast such responsibility upon the law firm of Rattikin and Spiller. The question thus resolved is whether the Title Company actually has refrained from such actions or whether it is doing them despite any intent not to. As we have stated, the record demonstrates that it has done them and is doing them. In the main, it appears that such action was inadvertent, but it also appears that some acts were intentionally performed through a mistaken opinion as to what constitutes the practice of law. The principal instances where the latter appears seem to be those in which legal instruments are in, or might be in, such form as satisfies the Title Company, in so far as the issuance of a title insurance policy would be concerned, but where the mortgage loan company requires additional provisions to be incorporated in the instruments as conditions precedent to the making of its loans.

A certain difficulty, unavoidable under the system of operation of the law business of Rattikin and Spiller and title business of Rattikin Title Company, was encountered in the maintenance of separate and distinct operations as between the Title Company and the law firm. Both members of the law firm were administrators of the business of

the Title Company. One of them was its chief executive. The law firm had numerous employees who were also employees of the Title Company, and many of these worked indiscriminately among and alongside the numerous employees of the Title Company alone, as well as among and alongside the numerous employees of the law firm alone. Adding to the difficulty was the fact that each of the members of the law firm, as administrators of the business of the Title Company, conducted the affairs of the Title Company from the same desk from which he conducted the business of the law firm. The public was misled, as well as even the clients of the law firm and the customers of the Title Company. In the record we see instances where the Title Company is frequently directed to do certain things which could only be properly done by an attorney, and we have no doubt but what members of the law firm (and its exclusive employees) were directed to do things properly done only by the Title Company. There is no doubt but what in the case of any similar interrelated activity of a sizeable law firm with a title company of a size comparable to that of the Rattikin Title Company, with any lengthy period of such intermingling of personnel one would always discover that certain of the exclusive employees of the Title Company would find themselves doing legal work for the clients of the law firm, and several of those exclusively employed by the law firm would find themselves performing work for the Title Company.

In the present instance, such interrelated activity by intermingled personnel resulted, as disclosed by the record, in the Rattikin Title Company (through its employees) performing acts which constituted the practice of law, to-wit: preparing legal instruments for persons and corporations other than itself and its principal in transactions whereby it neither had nor acquired any interest in the subject matter of the transaction,—and also resulted in it (through its employees) giving advice or making statements to persons other than its principal and its employees as to the purpose and effect of legal instruments in transactions to which neither the Title Company nor its principal was a party. These very acts on the part of the Title Company's employees constituted the unauthorized and illegal practice of law by the Title Company, and the trial court properly enjoined their continuance. The Title Company indirectly profited by such acts in the same manner that the Title Company profited in the Hexter case. That the Title Company might have committed or performed such acts inadvertently or unintentionally or through mistake constitutes no defense. It matters not why the acts were being done. That is not a matter for our inquiry and in this instance, at least, excuse for the commission of such acts is not before us.

Indeed, so long as the system of commingling the employees of the law firm with those of the Title Company shall persist, and so long as the system of doing business for both firms through individuals serving both (from the same "side of the table") shall persist, we readily perceive how—in view of the record's disclosure as to the volume of business handled by both the Title Company and law firm—at least some of the acts constituting the unauthorized practice of law will again, in time, be performed or committed by the Title Company even should it in good faith do all things possible to prevent such. If such acts should recur, in view of any subsisting order enjoining them, their performance would be imprudent conduct on the part of the Title Company, to say the least, and, to paraphrase Justice Holmes, should the Title Company walk too near the line that divides prudent from imprudent conduct, it takes the risk, and if it oversteps the line, it must bear the consequences with fortitude.

Besides its points of error which are disposed of by what we have said above, the appellant Title Company has assigned additional points wherein it contends that there was no urgent necessity for granting the temporary injunction and that since its granting virtually accomplished the object of the suit, it should not have been granted. The Title Company contends that the main objective of the Grievance Committee is to prevent the lawyers who work part time for

the Title Company from working part time for the law firm of Rattikin and Spiller. We do not view this as the Grievance Committee's objective, but whether it is or not, such was not enjoined by the court's order.

As to the urgent necessity warranting the granting of a temporary injunction, the Title Company states, "The rule for which we are now contending, namely that important and new questions of law should not be answered in a hearing on a temporary injunction, in the absence of a clear showing of an immediate necessity or emergency and unless the law is clear and positive in view of the facts, is clearly stated by the Texas Supreme Court in the case of Texas Foundries v. International M. & F. Workers [151 Tex. 239], 248 S.W.2d 460, 464, as follows: * * *." Thereafter follows the statement of the Supreme Court in that case to the effect that new and important law questions should reach the appellate courts for final determination in cases tried on their merits rather than in instances of temporary injunction.

▮▮▮ It is our opinion that the law is "clear and positive" as to the illegality of the acts enjoined. Such is demonstrated by the authorities, including the Hexter case. It is also our opinion that the facts proved upon the temporary injunction hearing were sufficient to entitle the trial judge to believe and decide that there was a continuing violation of the substantive law. The order of temporary injunction commands, in effect, that the Title Company "cease its unlawful action and desist from any resumption pending a trial of the merits of the case." We recognize that in the hearing upon an application for a temporary injunction the only question before the trial court is the right of the applicant to a preservation of the status quo of the subject matter of the suit pending a final trial of the case on its merits. James v. E. Weinstein & Sons, Tex.Com.App.1929, 12 S.W.2d 959; Transport Co. of Texas v. Robertson Transports, Tex.1953, 261 S.W. 2d 549. But in an injunction case wherein the very acts sought to be enjoined are acts which prima facie constitute the violation of expressed law, the status quo could never be a condition of affairs where the respondent would be permitted to continue the acts constituting that violation. In such instances, the status quo to be preserved by temporary injunction is the last, actual, peaceable, noncontested status which preceded the pending controversy, and when it is determined that the law is being violated it is the province and the duty of the court to restrain it. Gifford v. State, Tex. Civ.App., El Paso 1950, 229 S.W.2d 949; Transport Co. of Texas v. Robertson Transports, supra; Hartley v. Brady, Tex. Civ.App., Amarillo 1938, 114 S.W.2d 406; Dickard v. Crawley, Tex.Civ.App., Austin 1950, 230 S.W.2d 833. And in such instances, if the preservation of the status quo should accomplish the objective of the suit this is nevertheless as it should be, for no man may engage in actions in violation of the statutory law, or of a rule of law having similar force and authority. Gifford v. State, supra.

By a cross-point upon the appeal, the Grievance Committee contends that the trial court erred in refusing to enjoin the Title Company from acting as the attorney for mortgage loan companies to the extent of determining that certain legal instruments are in proper form before delivering over the money lent by them to other parties (contingent upon and in connection with pending purchase transactions) and held by the Title Company as an escrow agent.

▮▮▮ The cross-point presents a question of law not heretofore determined and not patently illegal. The right the Grievance Committee contends for will admit of doubt. The trial judge, in the exercise of his discretion, could therefore not be said to have abused that discretion in refusing to stay such action on the part of the Title Company in the order which he did enter upon temporary injunction proceedings. See 43 C.J.S., Injunctions, § 19, sub. (c), p. 434. We have no function on this appeal other than to determine whether or not the trial judge clearly abused his discretion. Texas Foundries v. International

Moulders & Foundry Workers' Union, 1952, 151 Tex. 239, 248 S.W.2d 460. But for such abuse his action will not be disturbed on appeal. Transport Co. of Texas v. Robertson Transports, supra.

Judgment of the trial court is affirmed.